UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SERGEY V GENSITSKIY,

                          Petitioner,

      v.

RON HAYNES,

                        Respondent.

Case No. 3:19-cv-05355-BHS-TLF

REPORT AND RECOMMENDATION

Noted for <u>November 20, 2020</u>

This matter comes before the Court on petitioner's petition for writ of *habeas corpus* under 28 U.S.C. § 2254, challenging the legality of his conviction for the crimes of one count of Child Molestation in the First Degree, one count of Child Molestation in the Second Degree, and two counts of Child Molestation in the Third Degree. Dkt. 8, at Exh. 12. Petitioner presents four grounds for *habeas* relief: (1) "the State violated procedural due process by failing to provide any notice at the time it obtained an *ex parte* order for unilateral access to the jury list in Petitioner's case"; (2) "[t]he State violated Petitioner's right to be present by submitting an *ex parte* motion to a superior court judge who was not assigned to hear Petitioner's case"; (3) [t]he State violated Petitioner's right to open and public proceedings by submitting an *ex parte* motion to a superior court judge who was not assigned to hear Petitioner's case"; and (4) "[t]rial counsel was ineffective by failing to object to the improper testimony of C.S.G.'s counselor to the effect that she had suffered from rape trauma syndrome and post-traumatic stress disorder as a result of Petitioner's criminal conduct." Dkts. 9, 1. In addition, petitioner has requested an evidentiary hearing in this matter. Dkt. 9.

For the reasons set forth below, the undersigned recommends that the request for an evidentiary hearing be DENIED, and that the petition be DISMISSED. Also, for

the reasons set forth below, the undersigned recommends that issuance of the

certificate of appealability (COA) be DENIED.

BACKGROUND

I.  Statement of Facts

In an unpublished opinion denying Mr. Gensitskiy's personal restraint petition

(PRP), the Washington Court of Appeals summarized the facts relevant to this matter as

follows:

> In 2011, the State charged Gensitskiy with a total of twelve counts of sex offenses against five different victims, including CSG.[1]
>
> I. PROPOSED ORDER AUTHORIZING REVIEW OF JURY BOOK AND JURY LIST (jury book order)
>
> On July 25, 2012, an omnibus hearing was held to address discovery and pretrial issues in Gensitskiy's case. The case was considered ready for trial the following week. Sometime after the hearing, the deputy prosecuting attorney in Gensitskiy's case, Anna Klein, sent a proposed order authorizing review of the jury book and jury list to the court for signature. As was Klein's practice, the proposed order was sent from the prosecutor's office with a runner for signature by an available judge. The prosecutor did not meet with the judge in order to obtain a signature for the proposed order.
>
> The proposed order allowed Klein to "remove the juror book and jury list from the [c]ourt for her personal review and immediate return to the [c]ourt." Declaration of Tom Maybrown, Appx. E (Order Authorizing Review of Jury Book (Including Jury List), filed Clark County Superior Ct., July 25, 2012 (jury book order). The jury book order also stated that "no copies will be made and no other person shall be allowed to review the material and the book shall be returned to the [c]ourt within twenty four hours[.]" Maybrown Decl., Appx. E. The jury book order was signed by Judge Stahnke. Judge Stahnke was not the assigned trial judge for Gensitskiy's trial.
>
> II. TRIAL TESTIMONY
>
> All the victims testified at trial. Because their testimony is not relevant to the issues Gensitskiy raises in his PRP, we do not recount the details here. One of the victims recanted his prior statements. Another victim testified that at one point she believed the allegations she had made but currently questioned whether they were true.
>
> Erin Haley is a child and family therapist. At the time of trial, Haley was seeing CSG weekly or every other week. Haley testified that the "initial concerns

[1] We use initials to protect the witness's identity. General Order 2011–1 of Division II, *In Re The Use Of Initials Or Pseudonyms For Child Witnesses In Sex Crime Cases*, available at: http://www.courts.wa.gov/appellate_trial_courts/ [Footnote by the Court of Appeals].

[CSG] came in for were related to sexual abuse." CD Proceedings, Vol. 2 at 284 (VRP). Haley testified as follows:

[STATE]: Okay. So did you ever find out from [CSG] what exactly it was that had happened to her sexually?

[HALEY]: Yes.

2 VRP at 284. Gensitskiy's counsel objected to Haley testifying as to CSG's statements, but the trial court overruled the objection.

Haley also testified,

[HALEY]: Well, I've offered a few diagnoses. Originally when I first met with her on November 3rd, 2010, I offered a diagnosis of sexual abuse of a child, which indicates she was a victim of sexual abuse. And that is how we treat children who come in through our specific sexual abuse grant.

....

[HALEY]: The diagnosis offered for [CSG] later in her treatment was posttraumatic stress disorder and also major depressive disorder.

[STATE]: And can you explain what those are, first of all?

[HALEY]: Sure. So posttraumatic stress disorder is a mental health condition that can come on after someone experiences a traumatic event. And it includes responses such as helplessness, extreme fear, anger, and those reactions are quite common to a traumatic event, though the symptoms in posttraumatic stress disorder last at least one month after the trauma and tend to either worsen or get to a level where they're interfering significantly in someone's life's functioning. So that's posttraumatic stress disorder.

2 VRP at 287–88. Gensitskiy did not object to any of the above testimony. On redirect, the following exchanges took place:

[STATE]: Okay. And what made you feel that her posttraumatic stress disorder is associated with a (sic) sexual abuse?

[HALEY]: Well, [CSG] had disclosed that she had experienced sexual abuse and that her flashbacks as part of her posttraumatic stress disorder were specific to the sexual abuse trauma.

[STATE]: And are her nightmares regarding any specific person or issue?

[HALEY]: Some of the nightmares [CSG] has endorsed are related to fearfulness about her father. They were more generalized, which is common, particularly for children. The nightmares were generally about her father hurting her, killing her, just fearful dreams about her father.

2 VRP at 308–09. Again, Gensitskiy did not object to Haley's testimony. Finally, on recross, Gensitskiy's counsel engaged in the following exchange with Haley:

[COUNSEL]: Is there any means as a counselor that you can ascertain as to whether or not the complaints of abuse are accurate?

[HALEY]: I would say that—I guess I'm having a hard time answering your question. The way I look at it is, it's not my job to investigate the allegations of the abuse. And so I take in the disclosures that individuals share with me along with some collaborative information to make my determination. But again, I'm not determining whether it's true or not. My job is to treat the individual with the symptoms that they come in for.

[COUNSEL]: So you're treating the sym—I don't want to put words in your mouth, but sounds like you're saying I'm treating the symptoms, not the allegations?

[HALEY]: I guess I'm not sure how I would treat allegations, so I think that's fair to say I'm treating the symptoms.

2 VRP at 314.

Dkt. 8, at Exh. 33 (*In re Gensitskiy*, Washington Court of Appeals No. 49044-7-II (unpublished opinion)).

II.  State Court Procedural History

A.     Direct Appeal

In August 2012, Mr. Gensitskiy was convicted, after an eight-day jury trial of Child Molestation in the First Degree of his children C.S.G. and D.S.G. (counts 2, 6), Child Molestation in the Second Degree of C.S.G. and D.S.G. (counts 3, 7), two counts of Child Molestation in the Third Degree of C.S.G. (counts 4, 5), and four counts of Incest in the Second Degree of D.S.G. (counts 8, 9, 10, 11). Dkt. 8, Exh. 17 (*State v. Gensitskiy*, No. 71640-9-I (unpublished opinion)). Mr. Gensitskiy appealed his convictions to the Washington Court of Appeals. *Id.*, Exhs. 13-17. Appellate counsel's brief raised a total of ten assignments of error, arguing (1) the trial court erred by allowing the State to amend the charges after the State rested, (2) & (3) the evidence was constitutionally insufficient with respect to counts 2 and 6, (4) & (5) count 7 of the information, and its to-convict instruction (Instruction No. 26), omitted an essential element and failed to charge a crime, (6) the court erred by failing to provide a limiting instruction when the witnesses were impeached with prior inconsistent statements, (7) the court erred by admitting evidence of an overheard telephone conversation, (8) the judgment and sentence erroneously described count 7 as first-degree child molestation, (9) the court erred by imposing indeterminate sentences for counts 2 and 7, and (10) applying the indeterminate sentencing law to crimes that may have occurred before its effective date violates ex post facto principles. *See* Dkt. 8, Exh. 13 (brief of appellant) at 1-2. The case was transferred to Division One of the Court of Appeals for decision. *Id.*, Ex. 16 (order transferring cases).

On July 7, 2014, a three-judge panel of the Court of Appeals issued an unpublished opinion affirming in part and reversing in part. *Id.*, Exh. 17 (*State v. Gensitskiy*, Washington Court of Appeals No. 71640-9-I (unpublished opinion)). The appellate court reversed the conviction for count 7, concluding the information omitted an essential element because it failed to state that the victim was over the age of twelve. *Id.*, at 3-4. The appellate court further held that the trial court erred by allowing the State to amend the information with respect to counts 8, 9, 10, and 11, and therefore reversed those counts. *Id.*, at 5-7. The State conceded that the evidence supporting count 6 was insufficient. Accordingly, the appellate court vacated that count. *Id.*, at 7. The State also conceded that Mr. Gensitskiy should not have received an indeterminate sentence under Wash. Rev. Code § 9.94A.507, which concession the appellate court accepted. *Id.*, at 13. The Court of Appeals affirmed the remaining convictions—the four counts (counts 2-5) involving Mr. Gensitskiy's daughter C.S.G.— and remanded for resentencing. *Id.*, at 14. The State filed a motion for reconsideration, which the court denied. *Id.*, Ex. 18 (motion for reconsideration); Ex. 21 (order denying reconsideration).

The State filed a petition for review with the Washington Supreme Court regarding the Court of Appeals' holding that the information was defective with respect to count 7. *Id.*, Ex. 22 (petition for review). Mr. Gensitskiy's appellate counsel filed an answer to the petition raising two additional grounds for review. *Id.*, Ex. 23 (answer to petition for review). Appellate counsel argued (1) Randy Patterson's (foster parent's) testimony concerning the overheard phone conversation violated the state's privacy law and should not have been admitted, and (2) the evidence supporting count 2 was

1  insufficient. *Id.* On March 5, 2015, the Washington Supreme Court denied review

2  without comment as to the State's petition and the additional issues raised in Mr.

3  Gensitskiy's answer. *Id.*, Ex. 24 (order denying review). The Court of Appeals issued its

4  mandate on April 17, 2015. *Id.*, Ex. 25 (mandate). Mr. Gensitskiy received a 198-month

5  determinate sentence on remand. *Id.*, Ex. 12 (amended judgment and sentence).

6  B.     Personal Restraint Petition

7         On June 10, 2016, Mr. Gensitskiy through counsel filed a personal restraint

8  petition (PRP) with the Court of Appeals. Dkt. 8, Exh. 26 (personal restraint petition, with

9  attached declarations). The petition raised five grounds for relief, arguing (1) the

10  prosecutor engaged in unlawful *ex parte* communications with the trial court in order to

11  obtain access to the jury book and jury list before trial, (2) the trial court's actions with

12  respect to the *ex parte* contacts violated the appearance of fairness, (3) the trial court's

13  actions violated Mr. Gensitskiy's rights to be present and to an open public trial, (4)

14  defense counsel provided ineffective assistance at trial, and (5) appellate counsel

15  provided ineffective assistance on direct appeal. *Id.*; Exh. 27 (amended opening brief) at

16  22-50. The Court of Appeals denied the petition in an opinion issued on April 10, 2018.

17  *Id.*, Exh. 33 (*In re Gensitskiy*, Washington Court of Appeals No. 49044-7-II (unpublished

18  opinion)).

19         Mr. Gensitskiy moved for discretionary review by the Washington Supreme

20  Court. *Id.*, Exh. 34 (motion for discretionary review). The motion for discretionary review

21  presented two grounds for relief:

22                 1. The deputy prosecuting attorney engaged in unlawful, *ex parte*
                   communications with a superior court judge to obtain a copy [of]
23                 the jury list before the *Gensitskiy* trial.
                   2. Trial counsel failed to object to expert testimony to the effect
24                 that the complaining witness was a survivor of sexual abuse at the

25

hands of the Petitioner and that she was suffering from post-
traumatic stress disorder.

*Id.*, Exh. 34, at 6-13 (claim 1); *id.* at 13-20 (claim 2). On April 3, 2019, the Supreme

Court denied review without comment. *Id.*, Exh. 38 (order denying review). The Court of

Appeals issued a certificate of finality on April 9, 2019. *Id.*, Exh. 39 (certificate of

finality). Petitioner subsequently filed the instant federal habeas petition. Dkt. 1.

EVIDENTIARY HEARING

The decision to hold a hearing is committed to the Court's discretion. *Schriro v.*

*Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a

hearing could enable an applicant to prove the petition's factual allegations, which, if

true, would entitle the applicant to federal habeas relief." *Landrigan*, 550 U.S. at 474.  In

determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review

is limited to the record before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 181

(2011). A hearing is not required if the allegations would not entitle petitioner to relief

under 28 U.S.C. § 2254(d). *Landrigan,* 550 U.S. at 474. "It follows that if the record

refutes the applicant's factual allegations or otherwise precludes habeas relief, a district

court is not required to hold an evidentiary hearing." *Id.*; *see also Cullen,* 563 U.S. 170,

181 (2011). The Court finds it unnecessary to hold an evidentiary hearing because, as

discussed below, Mr. Gensitskiy's claims may be resolved on the existing state court

record.

EXHAUSTION OF STATE COURT REMEDIES

The exhaustion of state court remedies is a prerequisite to the granting of a

petition for writ of *habeas corpus.* 28 U.S.C. § 2254(b)(1). If exhaustion is to be waived,

it must be waived explicitly by respondent. 28 U.S.C. § 2254(b)(3). A waiver of

exhaustion thus may not be implied or inferred. A petition can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider all claims before presenting them to the federal court. *Picard v. Connor*, 404 U.S. 270, 276 (1971); *Middleton v. Cupp*, 768 F.2d 1083, 1086 (9th Cir. 1985). Here, petitioner appears to have presented his claims to the Washington Supreme Court and thus exhausted his state court remedies. Respondent concedes petitioner's claims appear to be exhausted. Dkt. 7, at 7. Petitioner's claims, therefore, will now be reviewed on their merits.

DISCUSSION

I.  Standard of Review

A *habeas corpus* petition filed under 28 U.S.C. § 2254:

> [S]hall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" the Supreme Court's "clearly established precedent if the state court applies a rule that contradicts the governing law set forth" in the Supreme Court's cases. *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams*, 529 U.S. at 405-06). It also is contrary to the Supreme Court's clearly established precedent "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, "and nevertheless arrives at a result different from" that precedent. *Id.*

A state court decision involves an "unreasonable application" of the Supreme Court's clearly established precedent if: (1) the state court "identifies the correct governing legal rule" from the Supreme Court's cases, "but unreasonably applies it to the facts" of the petitioner's case; or (2) the state court "unreasonably extends a legal principle" from the Supreme Court's precedent "to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. The state court decision, however, must be "more than incorrect or erroneous." *Lockyer*, 538 U.S. at 75. That is, "[t]he state court's application of clearly established law must be objectively unreasonable." *Id.*; *see also Schriro*, 550 U.S. at 473.

This is a "'highly deferential standard,' which "demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.'" *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 662, 664 (2004)). "[H]abeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment)). "As a condition for obtaining habeas corpus from a federal court," therefore, "a state prisoner must show that the state court's ruling on the claim being presented was so lacking in justification that there was an error well understood and

1    comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.*

2    at 103.

3        A *habeas* petition also may be granted "if a material factual finding of the state

4    court reflects 'an unreasonable determination of the facts in light of the evidence

5    presented in the State court proceeding.'" *Juan H. v. Allen*, 408 F.3d 1262, 1270 n.8

6    (9th Cir. 2005) (9th Cir. 2005) (quoting 28 U.S.C. § 2254(d)(2)). A state court's factual

7    determination is "presumed to be correct," though, and the petitioner has "the burden of

8    rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §

9    2254(e)(1). As such, a district court "may not simply disagree with the state court's

10   factual determinations," but rather it must "conclude" that those determinations did not

11   have even "fair support" in the state court record. *Thatsaphone v. Weber*, 137 F.3d

12   1041, 1046 (8th Cir. 1998).

13       "[W]hether a state court's decision was unreasonable" also "must be assessed in

14   light of the record the court had before it." *Holland v. Jackson*, 542 U.S. 649, 652

15   (2004); *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003). The district court's review

16   "focuses on what a state court knew and did," and the state court's decision is

17   "measured against [the Supreme] Court's precedents as of 'the time the state court

18   renders its decision.'" *Cullen*, 563 U.S. at 182 (quoting *Lockyer v. Andrade*, 538 U.S. 63,

19   71-72 (2003)); *see also Greene v. Fisher*, 132 S.Ct. 38, 44 (2011). In addition, "federal

20   habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S.

21   62, 67 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court

22   determinations on state-law questions.") (quoting *Lewis v. Jeffers*, 487 U.S. 764, 780

23   (1990)). Furthermore, unless the error is considered structural, it must have "had

24

25

1    substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.*

2    *Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Katteakos v. United States*, 328 U.S.

3    750, 776 (1946)) (*habeas* petitioners "are not entitled to habeas relief based on trial

4    error unless they can establish that it resulted in 'actual prejudice.'") (quoting *United*

5    *States v. Lane*, 474 U.S. 438, 449 (1986)).

6    II.  Claims 1-3 – Jury Book

7            Claims 1-3 of the petition are all based on Mr. Gensitskiy's allegation that his

8    constitutional rights were violated by an *ex parte* pretrial order authorizing the

9    prosecutor to review the "jury book" pertaining to the venire members for Mr.

10   Gensitskiy's trial. Mr. Gensitskiy alleges that:

11           Before trial the prosecuting attorney secretly met with a judge who was not
             assigned to the case and obtained a document entitled "Order Authorizing
12           Review of Jury Book (Including Jury List)." This Order, which was drafted by the
             prosecutor, would allow the State unfettered access to the "juror book" and "jury
13           list" prior to trial. The order provided no similar authorization for the defense and
             stated that "no other party shall be allowed to review the material." This Order
14           was presented in an ex parte proceeding. The State's request – and its intention
             to present this type of Order – was never mentioned during the hearing of July
15           25, 2012. Neither defense counsel nor Petitioner were present when DPA Klein
             obtained the Order and there is no "record" of any public proceeding relating to
16           the motion. The Order provides no explanation or justification for the ex parte
             nature of this motion. By obtaining the jury list in advance of trial, the State
             obtained an unfair advantage during the jury selection process.

17   Dkt. 1, at 6-9 (Grounds 1-3).

18           In Claims 1-3 of his federal habeas petition Mr. Gensitskiy alleges: (1) "[t]he State

19   violated procedural due process by failing to provide any notice at the time it obtained

20   an *ex parte* order for unilateral access to the jury list in Petitioner's case"; (2) "[t]he State

21   violated Petitioner's right to be present by submitting an *ex parte* motion to a superior

22   court judge who was not assigned to hear Petitioner's case"; (3) "[t]he State violated

23

24

25

Petitioner's right to open and public proceedings by submitting an *ex parte* motion to a superior court judge who was not assigned to hear Petitioner's case." Dkt. 9.

A.      *Ex Parte* Communication

Petitioner contends the *ex parte* order permitting the prosecutor access to the jury book and jury list before trial violated his due process rights. Dkts. 1, 9. Petitioner argues this was a structural error requiring automatic reversal and, even if the Court does not consider it a structural error, the error was not harmless as he suffered prejudice. *Id.*

1.      No Structural Error

The Supreme Court has "adopted the general rule that a constitutional error does not automatically require reversal of a conviction ... and has recognized that most constitutional errors can be harmless." *Arizona v. Fulminante,* 499 U.S. 279, 306 (1991). Automatic reversal is required only if the error was a "structural defect" that permeated "[t]he entire conduct of trial from beginning to end" or "affect[ed] the framework within which the trial proceeds." *Id.*, at 309–10; *Hereford v. Warren*, 536 F.3d 523, 528 (6th Cir. 2008). As the Supreme Court has held, it "typically designate[s] an error as 'structural,' therefore 'requir[ing] automatic reversal,' only when 'the error necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'" *Rivera v. Illinois*, 556 U.S. 148, 160–61 (2009) (quoting *Washington v. Recuenco,* 548 U.S. 212, 218–219 (2006)).

The Supreme Court has "found structural error only in a very limited class of cases." *Johnson v. United States,* 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). Such structural errors include: total deprivation of the right to counsel, *Gideon v.*

1   *Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); lack of an impartial trial

2   judge, *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); unlawful

3   exclusion of grand jurors of the defendant's race, *Vasquez v. Hillery*, 474 U.S. 254, 106

4   S.Ct. 617, 88 L.Ed.2d 598 (1986); denial of the right to self-representation at trial,

5   *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); denial of the

6   right to a public trial[2], *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31

7   (1984); denial of the right to a jury verdict of guilt beyond a reasonable doubt, *Sullivan v.*

8   *Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); and the denial of

9   counsel at a "critical stage" of the criminal proceedings, *United States v. Cronic*, 466

10  U.S. 648, 659 & n. 25, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

11         It does not appear that the Supreme Court has ever held an *ex parte*

12  communication to be a structural error. In *Rushen v. Spain*, 464 U.S. 114, 117-19, 104

13  S.Ct. 453, 78 L.Ed.2d 267 (1983), the Supreme Court held that an *ex parte*

14  communication between a judge and juror was not a structural error requiring automatic

15  reversal and is subject to the harmless error analysis. *See McNeil v. Castro*, 81 F. App'x

16  901, 901–02 (9th Cir. 2003) ("[Appellant's] argument that an *ex parte* communication is

17  a structural constitutional error requiring automatic reversal is foreclosed by the

18  Supreme Court's decision in *Rushen v. Spain* […] Because the Supreme Court has

19  never held that an *ex parte* communication is a structural error, such a ruling is not

20  dictated by Supreme Court precedent."); *see also Yohn v. Love*, 76 F.3d 508, 522 (3d

21  Cir. 1996) (no structural error and reviewing error for harmlessness where prosecutor's

22

23  _____

    [2] The Court notes that Mr. Gensitskiy has also argued that his right to a public trial was violated. As
24  discussed later in the Report and Recommendation, the state appellate court reasonably determined that
    Mr. Gensitskiy's right to a public trial did not attach in this circumstance. See *infra* Discussion Section II.B.
25

*ex parte* discussion with state Supreme Court Chief Justice resulted in the Chief Justice advising the trial court to admit evidence it would have otherwise excluded); *United States v. Earley,* 746 F.2d 412, 416–18 (8th Cir. 1984) (no structural error found for submission of *ex parte* trial brief); *United States v. Walsh*, 700 F.2d 846, 858 (2d Cir. 1983) (no structural error found for *ex parte* proffer of evidence); *United States v. DeLeo*, 422 F.2d 487, 499 (1st Cir. 1970) (no structural error found for *ex parte* discussion about prosecutor's illness); *Hereford*, 536 F.3d at 531 (finding the state court reasonably refused to deem improper *ex parte* discussion between judge and prosecutor structural error).

The Court also notes that, while the Court is not aware of any Supreme Court cases addressing the specific issue raised in this case (and Mr. Gensitskiy does not cite to any), the Supreme Court has addressed state law errors under other circumstances in the jury selection context[3] and found no structural error. For instance, in *Rivera v. Illinois*, 556 U.S. 148, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009), the defendant argued the trial court committed structural error in improperly denying a peremptory challenge to a juror, because the jury became an "illegally constituted tribunal, and any verdict it render[ed] [was] *per se* invalid." *Rivera v. Illinois*, 556 U.S. 148. The Supreme Court rejected this argument finding the state trial judge's good-faith error in denying a defendant's peremptory challenge to a prospective juror, who subsequently served as foreperson on the jury that found defendant guilty of first degree murder, was not a structural error necessarily rendering defendant's criminal trial fundamentally unfair or

---

[3] The Court notes that these cases do not directly address the circumstances of the instant case as they dealt with alleged errors during the actual jury selection process while the *ex parte* order in this case was issued several days prior to jury selection.

1    an unreliable vehicle for determining guilt or innocence, as would warrant reversal. *Id.* In

2    reaching this conclusion, the Supreme Court reiterated that "errors of state law do not

3    automatically become violations of due process" and that, provided all jurors seated in a

4    criminal case are qualified and unbiased, the Due Process Clause did not require

5    automatic reversal of a conviction because of the trial court's good-faith error in denying

6    the defendant's peremptory challenge to a juror in violation of state law. *Id.*

7          The Washington Court of Appeals rejected the argument that the *ex parte* order

8    in this case constituted structural error:

9          Gensitskiy claims that the jury book order was an improper ex parte
      communication between [the prosecutor] Klein and the trial court. Because
10   Gensitskiy cannot show actual and substantial prejudice resulting from the jury
      book order, we deny his petition on this ground.
11   A. NO STRUCTURAL ERROR
      Gensitskiy argues that the ex parte communication should be considered
12   structural error and, therefore, he should not be required to demonstrate actual
      and substantial prejudice in order to be entitled to relief on his petition. We
13   disagree because the ex parte communication here does not undermine the
      reliability of the criminal trial. Furthermore, other types of ex parte
14   communications are subject to harmless error analysis and are not treated as
      structural error. Therefore, this ex parte communication should not be considered
15   structural error.
            "Structural error is a special category of constitutional error that 'affect[s]
16   the framework within which the trial proceeds, rather than simply an error in the
      trial process itself.' " *State v. Wise*, 176 Wn.2d 1, 13–14, 288 P.3d 1113 (2012)
17   (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 113 L.Ed. 2d
      302 (1991) ) (alteration in original). "Where there is structural error 'a criminal trial
18   cannot reliably serve its function as a vehicle for determination of guilt or
      innocence, and no criminal punishment may be regarded as fundamentally fair.' "
19   *Wise*, 176 Wn.2d at 14 (internal quotation marks omitted) (quoting *Fulminante*,
      499 U.S. at 310). Structural errors are not subject to harmless error analysis and
20   a defendant is not required to show specific prejudice to be entitled to relief.
      *Wise*, 176 Wn.2d at 14.
21         Moreover, in other contexts, such as improper ex parte communications
      between a judicial officer and the jury, our Supreme Court has held that
22   "[a]lthough an improper communication between the court and the jury is an error
      of constitutional dimensions, the communication may be so inconsequential as to
23   constitute harmless error." *State v. Bourgeois*, 133 Wn.2d 389, 407, 945 P.2d
      1120 (1997) (citations omitted). Under this standard, the defendant must first
24   raise the possibility that he or she was prejudiced by the improper
      communication. *Bourgeois*, 133 Wn.2d at 407. Then the State bears the burden

25

1    of showing that the error was harmless beyond a reasonable doubt. *Bourgeois*,
     133 Wn.2d at 407.

2            Here, the jury book order does not undermine the reliability of the criminal

3    trial because it did not affect the framework of the trial itself. The foundational
     framework of the criminal trial such as open voir dire of the jury and the

4    presentation of evidence remained intact, and Gensitskiy makes no arguments
     regarding them. Accordingly, nothing about the jury book order interfered with the
     framework of the trial or rendered the proceeding fundamentally unfair.

5            And Gensitskiy presents no argument explaining why ex parte
     communications between judges and jurors should not be subject to a harmless

6    error analysis, or why this ex parte communication, obtaining an order ex parte,
     should be considered differently from other types of ex parte communications.

7    Therefore, we will not deviate from precedent and declare this ex parte
     communication to be structural error. Because the ex parte communication used

8    to obtain the jury book order should not be considered structural error, Gensitskiy
     is required to demonstrate actual and substantial prejudice to be entitled to relief
     on his petition.

9

10   Dkt. 8, at Exh. 33 (*In re Gensitskiy*, Washington Court of Appeals No. 49044-7-II

11   (unpublished opinion) (footnotes omitted)).

12          The state appellate court's finding that the *ex parte* order in this case did not

13   constitute structural error does not contradict or unreasonably apply clearly established

14   federal law. There is no material factual dispute that the jury book order was submitted

15   *ex parte* and signed by a different judge than the judge who presided over the trial

16   several days prior to the commencement of jury selection.[4] Mr. Gensitskiy does not cite

17   any Supreme Court case, nor does there appear to be any such case, that has squarely

18   addressed *ex parte* communication between the judge and prosecutor or submission by

19   a prosecutor of a pretrial *ex parte* motion of this nature. *See, e.g., McNeil v. Castro*, 81

20

21   _____

     [4] The Court notes that petitioner makes several arguments challenging the state appellate court's
     description of the *ex parte* order as "ministerial" and submitted pursuant to a "local court rule." But the

22   Court need not reach those arguments specifically because the Supreme Court has not squarely
     addressed *ex parte* communication between the judge and prosecutor much less submission by a

23   prosecutor of a pretrial *ex parte* motion to review the jury book (these facts are not materially disputed in
     the record here). The Court also notes, however, that there is no evidence in the record materially

24   disputing the prosecutor (DPA Klein's) declaration that she was not present when the *ex parte* order was
     signed and that she simply had it sent over for signature by an available judge without argument.

25

     REPORT AND RECOMMENDATION - 16

F. App'x 901, 902 (9th Cir. 2003) ("Because the Supreme Court has never held that an *ex parte* communication is a structural error, such a ruling is not dictated by Supreme Court precedent."); *Hereford v. Warren*, 536 F.3d 523, 529 (6th Cir. 2008) ("The Supreme Court, […] has never indicated that an improper *ex parte* conference between the judge and prosecutor during trial amounts to [denial of counsel at a critical stage and a structural error under] *Cronic*[.]"); *Sanders v. White*, No. CIV. 03-455-ART, 2015 WL 711262, at *17 (E.D. Ky. Feb. 18, 2015), *judgment vacated in part on reconsideration*, No. CIV. 03-455-ART, 2015 WL 4394169 (E.D. Ky. July 15, 2015) ("No Supreme Court opinion squarely addresses *ex parte* communication between the judge and prosecutor or articulates a constitutional right to a trial free from such *ex parte* comments.");

Mr. Gensitskiy cites to *Yohn v. Love*, 76 F.3d 508 (3d Cir. 1996) and *United States v. Minsky*, 963 F.2d 870, 873 (6th Cir. 1992) as examples of circumstances under which courts have found structural error where there were *ex parte* contacts. But decisions from the federal courts of appeals are not clearly established law under the AEDPA. *See* 28 U.S.C. § 2254(d)(1); *Lopez v. Smith,* 135 S.Ct. 1, 2 (2014) ("We have emphasized ... that [AEDPA] prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'"). Furthermore, as noted above, to the extent the Supreme Court has addressed *ex parte* communications in another context (between judges and jurors) it has found that such communications are not structural errors and are subject to harmless error analysis. *See Rushen v. Spain,* 464 U.S. 114, 117-19, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). The Court also notes that in considering state law errors under

different circumstances in the jury selection context, specifically in the context of the improper denial of peremptory challenges, the Supreme Court has also found there to be no structural error. *See*, *Rivera v. Illinois*, 556 U.S. 148, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009).

Accordingly, Mr. Gensitskiy fails to show the state appellate court's finding of no structural error under the circumstances here was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or to otherwise demonstrate any violation of his constitutional rights.

2.    Harmless Error

Mr. Gensitskiy argues that even if the trial court's error was not structural, he is entitled to habeas relief because issuance of the jury book order resulted in actual prejudice. Dkt. 9.

On federal habeas review, even if an error of constitutional dimension is established, unless the error is a structural error, a petitioner is entitled to relief only if he can demonstrate that the error resulted in actual prejudice. *Davis v. Ayala*, 576 U.S. 257, 267 (2015); *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). The harmless-error standard on habeas review provides that "relief must be granted" if the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). This standard is satisfied if the record raises "grave doubt[s]" about whether the error influenced the jury's decision. *Ayala*, 576 U.S. at 267-68 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

Under AEDPA, a reviewing court must accord deference to a state's harmless error determination. And, as noted above, a petitioner must satisfy the *Brecht* prejudice

1    test in order to obtain federal habeas relief. The Supreme Court has explained that

2    when a petitioner contests a state court's determination that a constitutional error was

3    harmless, "the *Brecht* test subsumes the limitations imposed by AEDPA." *Ayala*, 576 at

4    268 (citing *Fry v. Pliler*, 551 U.S. 112, 119-20 (2007)).

5         Here, the Washington Court of Appeals found Mr. Gensitskiy failed to show

6    actual and substantial prejudice:

7
          NO ACTUAL AND SUBSTANTIAL PREJUDICE
8
               Gensitskiy claims that he has demonstrated actual and substantial
9        prejudice because the State had the opportunity to perform additional
         background checks and internet searches regarding the potential jurors.
10       However, this entire argument is based on speculation. Gensitskiy has not
         provided any evidence regarding what the State actually did with the jury book
11       after obtaining it. Moreover, Gensitskiy has not provided any evidence supporting
         the contention that his defense was prejudiced by not having the jury book.
12             The only evidence regarding prejudice Gensitskiy has produced is
         Buckley's declaration stating that, if he had known Klein was going to obtain the
13       jury book, he would have obtained the jury book as well. Because Buckley does
         not provide any facts as to what he would have done with the jury book, how
14       having the jury book would have benefitted Gensitskiy's defense, or how
         Gensitskiy's defense was prejudiced by not having the jury book, there is no
15       evidence of actual and substantial prejudice in the record before us. Accordingly,
         Gensitskiy has failed to meet his burden to show actual and substantial prejudice
         from the ex parte communication resulting in the jury book order.[5]
16       Mr. Gensitskiy argues he was prejudiced by the issuance of the *ex parte* jury

17   book order and points to the declaration of Barbara Corey, Esq., which was submitted to

18   the state appellate courts in support of Mr. Gensitskiy's PRP. In her declaration Ms.

19   Corey, a defense attorney who previously worked in the Pierce County Prosecuting

20   Attorney's office, states in relevant part:

21            It is noteworthy that the prosecution obtained this Order approximately
         five days before the commencement of the Gensitskiy trial. With this information
22

23   _____

     [5] "Although we assume, without deciding that obtaining the jury book order ex parte was erroneous, we
     note that the best practice is to always provide notice to opposing parties to avoid *ex parte* contact with
24   the court" [Footnote 3 by the Court of Appeals].

25

REPORT AND RECOMMENDATION - 19

1

2

in hand, the prosecutor was afforded an opportunity to conduct a thorough investigation regarding each potential juror in the Gensitskiy case. Such early disclosure would allow the prosecution to utilize support staff or law enforcement officers to assist with the investigation. Given the available resources, the prosecution could use this information to run background checks and searches regarding each potential juror to determine their contacts with law enforcement. These contacts would include whether the potential juror was a suspect, an alleged victim, a witness, a reporting party, charged with an offense, and, if so, the disposition of the offense. With the juror information, the prosecution could also run searches on the JIS system regarding each potential juror. Moreover, the prosecution could utilize this information to complete general computer searches, background investigation, and to review social media platforms. The information gleaned from such an investigation is invaluable to the jury selection process. Simply put, the party with such information has superior data with which to select the best jury for her client.

3

4

5

6

7

8

9

As a general matter, it is my belief that the prosecution has superior abilities to assess the fitness of potential jurors from the State's perspective in any case. In the Gensitskiy case, however, the prosecutor was afforded an additional (and extraordinary) advantage by obtaining juror information – including a complete copy of the juror book and jury list – a full five days before the trial was scheduled to commence.

10

11

Dkt. 8, Exh. 26.

12

13

Mr. Gensitskiy's trial attorney, Charles Buckley, Jr., also submitted a declaration in support of Mr. Gensitskiy's PRP. Mr. Buckley's declaration states, in relevant part,

14

15

16

17

18

19

From all appearances, the Order Authorizing Review of Jury Book (Including Jury List) was signed by Clark County Superior Court Judge Daniel Stahnke on July 25, 2012. The Gensitskiy case was assigned to Judge Wulle and trial commenced before Judge Wulle on July 30, 2012. I have no recollection that Judge Stahnke had any involvement in these matters. Also, I have no idea how the prosecutor obtained this Order in an ex parte manner. I was never provided any notice that the prosecutor intended to obtain an Order so that she could review the "juror book" and "jury list" prior to the trial in Sergey's case. Given these circumstances, the defense was never given any opportunity to set forth any opposition to the State's motion as set forth in the Order – or to participate in any court proceedings in regard to the State's motion to review the juror book and jury list.

20

21

It was always my intention to provide Sergey Gensitskiy the best defense in his case. If I had known that the prosecutor intended to obtain the juror list and jury book on July 25, 2012, I would have insisted that these same benefits be given to the defense.

22

Dkt. 8, Exh. 26.

23

24

The inquiry here is whether, in light of the record as a whole, issuance of the *ex parte* jury book order, substantially influenced the verdict. As the state appellate court

25

REPORT AND RECOMMENDATION - 20

points out, Mr. Buckley does not indicate in his declaration that he would have made different decisions during jury selection if he had reviewed the jury materials prior to trial, how having the jury book would have benefited Mr. Gensitskiy's defense, or how his defense was specifically prejudiced by not having the jury book. Mr. Buckley also does not indicate that he was unable to review the jury book materials during jury selection. Mr. Gensitskiy also makes no argument and presents no evidence that the jury that was selected was in any way unqualified or biased.

Mr. Gensitskiy speculates that if he had had notice of the *ex parte* motion to review the jury book, he could have asked the trial court judge to limit or curtail the prosecutor's attempts to conduct an investigation or obtained an order requiring the State to provide pretrial disclosure of any information obtained in the investigation. But Mr. Gensitskiy's trial counsel, Mr. Buckley, does not claim he would have done this nor is there any evidence in the record that the prosecutor conducted any such investigation. Ms. Corey's declaration regarding what the prosecutor might have done with the jury book is based entirely on speculation.

Mr. Gensitskiy also asserts that the fact the prosecutor used all six peremptory challenges in selecting jurors demonstrates the State obtained an advantage by reviewing the jury book. But the mere fact that the prosecutor exercised all of her peremptory challenges without more neither proves nor even implies anything. Thus, the Court concludes there is simply no evidence in the record that issuance of the *ex parte* jury book order in this case substantially influence the verdict.

To the extent Mr. Gensitskiy argues the state appellate court should have conducted an evidentiary hearing to allow him to demonstrate prejudice, the Court

concludes the state appellate court's decision not to conduct such a hearing was not

unreasonable. "A state court's decision not to hold an evidentiary hearing does not

render its fact-finding process unreasonable so long as the state court could have

reasonably concluded that the evidence already adduced was sufficient to resolve the

factual question." *Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012) (*citing Earp

v. Ornoski,* 431 F.3d 1158, 1170 (9th Cir. 2005) (noting that a state court is not required

to hold an evidentiary hearing when it is possible to resolve the factual question "based

on 'documentary testimony and evidence in the record'" (citation omitted)); *Perez v.

Rosario,* 459 F.3d 943, 950 (9th Cir. 2006) (holding that it is reasonable for a state court

to resolve a disputed factual question without an evidentiary hearing when the

petitioner's allegations are "incredible in light of the record, or ... when the record

already before the court is said to establish a fact conclusively"). "The ultimate issue is

whether the state's fact-finding procedures were reasonable; this is a fact-bound and

case-specific inquiry." *Hibbler*, 693 F.3d at 1147.

"Deference to a state court's conclusion that any deficiency did not result in

prejudice requires us to ask whether such a determination by the state court 'would be

unreasonable.'" *Gulbrandson v. Ryan*, 738 F.3d 976, 991 (9th Cir. 2013) (*citing Premo

v. Moore,* 562 U.S. 115 (2011); *see also Harrington v. Richter*, 562 U.S. 86 (2011)

(holding that "[i]t would not have been unreasonable" for the state court to conclude that

the petitioner's evidence of prejudice did not make it "reasonably likely" that the result

would have been different).). "Where there is no likelihood that an evidentiary hearing

would have affected the determination of the state court, its failure to hold one does not

1  make such determination unreasonable." *Perez v. Rosario,* 459 F.3d 943, 951 (9th Cir.

2  2006).

3         Given the dearth of specific evidence in the record to support Mr. Gensitskiy's

4  claim of prejudice, the Court concludes that the state's fact-finding procedures here

5  were reasonable.

6         Accordingly, as petitioner fails to demonstrate issuance of the *ex parte* jury book

7  order had a substantial and injurious effect or influence in determining the jury's verdict,

8  this claim should be denied.

9  B.    Public Trial.

10        The Sixth Amendment provides, in relevant part, that "[i]n all criminal

11 prosecutions, the accused shall enjoy the right to a speedy and public trial …."  The

12 right to a public trial is applicable to state-court proceedings under the Fourteenth

13 Amendment. *In re Oliver*, 333 U.S. 257, 273 (1948). The right extends to the entire trial,

14 including jury voir dire. *Presley v. Georgia*, 558 U.S. 209, 212 (2010) (per curiam).

15 "'The denial of a defendant's Sixth Amendment right to a public trial requires some

16 affirmative act by the trial court meant to exclude persons from the courtroom.' …

17 Accordingly, a defendant's right to a public trial is only implicated by a 'closure.'" *United*

18 *States v. Shyrock*, 342 F.3d 948, 974 (9th Cir. 2003) (quoting *United States v. Al Smadi*,

19 15 F.3d 153, 155 (10th Cir. 1994)).

20        A criminal defendant has a right under the Sixth Amendment to a public trial.

21 The Supreme Court has held that the Sixth Amendment right to a public trial extends to

22 the *voir dire* of prospective jurors. *Press–Enterprise Co. v. Superior Court of California*,

23 464 U.S. 501 (1984); *see also Presley v. Georgia*, 558 U.S. 209, 212-213 (2010). Total

24

25

closure of a public trial, over the defendant's objection, must be analyzed under the following factors: "[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Waller v. Georgia,* 467 U.S. 39, 48 (1984). The right to a public trial was created for the benefit of defendants, and allows for the public to see that the accused is treated fairly, helps ensure that the judge and prosecutor carry out their duties responsibly, encourages witnesses to come forward, and discourages perjury. *Id.* at 46; *U.S. v. Sherlock,* 962 F.2d 1349, 1356 (9th Cir. 1989).

Although Supreme Court precedent provides the only relevant source of clearly established federal law for AEDPA purposes, circuit precedent can be "persuasive authority for purposes of determining whether particular state court decision is an 'unreasonable application' of Supreme court law," and in ascertaining "what law is 'clearly established.'" *Duhaime v. Ducharme,* 200 F.3d 597, 600–01 (9th Cir. 2000). The Second Circuit has held that an unjustified closure that does not undermine the values furthered by the public trial guarantee does not violate the Sixth Amendment. *Peterson v. Williams,* 85 F.3d 39, 42–43 (2nd Cir. 1996) (20 minute closure found too trivial).

The Ninth Circuit has applied *Peterson* to hold that a trivial closure of routine jury administrative matters does not violate the Sixth Amendment where the closure does not "involve[ ] the values that the right to a public trial serves[.]" *United States v. Ivester,* 316 F.3d 955 (9th Cir. 2003) (*citing Peterson,* 85 F.3d at 43 and *Waller,* 467 U.S. at 46–

1    47) ("very brief" closure to question jurors found too trivial to implicate the Sixth

2    Amendment).

3         The Washington Court of Appeals rejected Mr. Gensistkiy's claim that the trial

4    court's signing of the jury book order without a public hearing violated his right to a

5    public trial. Specifically, the Court of Appeals found:

6              Gensitskiy also argues that his right to a public trial was
         violated when the trial court signed the jury book order without a
7        public hearing. Obtaining the jury book order does not implicate
         the public trial right.
8              Both the United States Constitution and the Washington
         Constitution guarantee a criminal defendant the right to a public
9        trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. We
         review whether a defendant's right to a public trial has been
10       violated de novo. *Wise*, 176 Wn.2d at 9.
              To determine whether a defendant's public trial right has
11       been violated, we engage in a three-part inquiry:
         (1) Does the proceeding at issue implicate the public trial right?
12       (2) If so, was the proceeding closed? And
         (3) If so, was the closure justified?
13       *State v. Smith*, 181 Wn.2d 508, 521, 334 P.3d 1049 (2014). "[N]ot
         every interaction between the court, counsel, and defendants will
14       implicate the right to a public trial, or constitute a closure if closed
         to the public." *State v. Sublett*, 176 Wn.2d 58, 71, 292 P.3d 715
15       (2012). If we conclude that the right to a public trial does not apply
         to the proceeding at issue, we do not reach the second and third
         steps in the analysis. *Smith*, 181 Wn.2d at 519.
16            To determine whether the public trial right attaches, we
         apply the "experience and logic" test. *Sublett*, 176 Wn.2d at 72–
17       73. Under the experience prong, we consider whether the
         proceeding at issue has historically been open to the public.
18       *Sublett*, 176 Wn.2d at 73. Under the logic prong, we ask "'whether
         public access plays a significant positive role in the functioning of
19       the particular process in question.'" *Sublett*, 176 Wn.2d at 73
         (quoting *Press–Enter.Co. v. Superior Court of Calf.*, 478 U.S. 1, 8,
20       106 S. Ct. 2735, 92 L.Ed. 2d 1 (1986). If both prongs are satisfied,
         the public trial right attaches. *Sublett*, 176 Wn.2d at 73.
21            Here, the experience prong indicates that the public trial
         right would not attach. Historically, not all aspects of jury selection
22       implicate the public trial right. For example, the statutory or
         administrative dismissal of jurors does not implicate the public trial
23       right. *See, e.g.*, *State v. Russell*, 183 Wn.2d 720, 730–31, 357
         P.3d 38 (2015); *State v. Slert*, 181 Wn.2d 598, 604–08, 334 P.3d
24       1088 (2014); *State v. Wilson*, 174 Wn. App. 328, 331, 298 P.3d
         148 (2013). The ex parte communication was simply to view the
         jury book and juror list. It was an administrative task that did not

25

1

2

3

4

5

6

7

8

9

10

        result in any action directly affecting the potential jurors. Because the jury book order was administrative and did not interfere with the aspects of jury voir dire that historically take place in an open courtroom—questioning potential jurors in voir dire, making challenges for cause—the experience prong is not satisfied and the public trial right is not implicated. *See State v. Love*, 183 Wn.2d 598, 605–06, 354 P.3d 841 (2015) (for cause and peremptory challenges implicate the public trial right).

        The logic prong also does not support concluding that the public trial right is implicated by an ex parte communication to view the jury book and juror list. Under the logic prong, we consider whether public access plays a significant positive role in the functioning of the particular process in question. Here, there is no indication that public access would influence the function of obtaining an order to view the jury book and the juror list because, from the record before us, jury book orders are routinely granted for clerical and administrative purposes, without argument, under a local court rule. Accordingly, the logic prong is not satisfied and obtaining the jury book order does not implicate the public trial right. Thus, Gensitskiy's public trial right was not violated.

11

Dkt. 8, at Exh. 33 (*In re Gensitskiy*, Washington Court of Appeals No. 49044-7-II

12

(unpublished opinion)).

13

       Mr. Gensistskiy argues the state court's decision, that obtaining the jury book

14

order did not implicate the public trial right, was contrary to, and involved an

15

unreasonable application of Supreme Court precedent. Specifically, Mr. Gensistkiy cites

16

to *Waller v. Georgia*, 467 U.S. 39 (1984), and *Presley v. Georgia*, 558 U.S. 209 (2010)

17

(per curiam). Dkt. 9, at 20-22. In *Waller* the Court found the Sixth Amendment right to a

18

"public trial" extended to a pretrial hearing on a motion to suppress evidence in a

19

criminal case. *Waller*, 467 U.S. 39. In *Presley*, the Court declared that the right to a

20

public trial also extended to jury *voir dire* proceedings. *Presley*, 558 U.S. 209.

21

       The state appellate courts' decision in this case is not contrary to either *Waller* or

22

*Presley*.[6] Neither decision addressed whether the right to a public trial is implicated by a

23

24

[6] The Court notes that although the Washington Court of Appeals cited primarily state court precedent in deciding this issue, "[a] state court's decision is not 'contrary to ... clearly

25

REPORT AND RECOMMENDATION - 26

trial court's pretrial signing of an *ex parte* order authorizing the prosecutor to review the jury book. *Waller* considered whether a defendant's public trial right "extends beyond the actual proof at trial," and found it extended to a pretrial suppression hearing in a criminal case. *Waller*, 467 U.S. at 44. In making this finding the Court noted that "suppression hearings often are as important as the trial itself," and that "a suppression hearing often resembles a bench trial," in that "witnesses are sworn and testify, and of course counsel argue their positions." *Id.*, at 46-47; *see Smith v. Titus*, 958 F.3d 687, 692 (8th Cir. 2020). *Presley* held that the public trial right also encompasses the jury selection process and *voir dire* of prospective jurors. *Presley*, 558 U.S. at 213. The Court in *Presley* also cited a previous decision relying on the extensive history of public jury selection in holding that the press and the public enjoy a First Amendment right to attend *voir dire* proceedings. *Id.*; *see Press-Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501, 505-10 (1984); *see also Smith*, 958 F.3d at 692.

The holdings in *Waller* and *Presley* applied specifically to suppression hearings and jury selection proceedings. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000) ("clearly established Federal law" under AEDPA refers to the holdings of the Supreme Court.). Neither decision addressed whether a defendant enjoys a right to a public hearing on the trial court's pretrial signing of an *ex parte* order authorizing the prosecutor to remove the jury book for review prior to the commencement of jury selection proceedings and trial. This case is materially distinguishable on the facts and

---

established Federal law" simply because the court did not cite our opinions.' … We have held that a state court need not even be aware of our precedents, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Mitchell v. Esparza*, 540 U.S. 12, 16, 124 S. Ct. 7, 10, 157 L. Ed. 2d 263 (2003) (citing *Early v. Packer,* 537 U.S. 3, 7–8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002).

1    presents a different issue of law than that addressed by *Wall*er and *Presley*. *See, e.g.,*

2    *Smith v. Titus*, 958 F.3d 687, 692 (8th Cir. 2020) (Denying habeas relief and finding the

3    state appellate court's decision was "not contrary to either *Waller* or *Presley* as neither

4    decision addressed whether what [the state appellate court] described as

5    'administrative' proceedings—that is, 'routine evidentiary rulings and matters

6    traditionally addressed during private bench conferences or conferences in chambers,'

7    […] implicate the Sixth Amendment right to a public trial."). Mr. Gensitskiy cites to no

8    Supreme Court precedent, nor is the Court aware of any, stating that the public trial

9    right attaches at this stage of the proceedings to the *ex parte* pretrial signing of a jury

10   book order.

11        To the extent Mr. Gensistkiy argues *Waller* and *Presley* should be extended to

12   cover the circumstances in this case, the Court finds that "fairminded jurists could

13   disagree" with this argument. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

14   Accordingly, Mr. Gensistkiy fails to demonstrate the state courts' adjudication of this

15   claim was contrary to or an unreasonable application of clearly established federal law

16   as determined by the United States Supreme Court, or to otherwise demonstrate any

17   violation of his constitutional rights.

18        Accordingly, this claim should be denied.

19   C.    Defendant's Right to be Present at a Critical Stage

20        "[A] defendant is guaranteed the right to be present at any stage of the criminal

21   proceeding that is critical to its outcome if his presence would contribute to the fairness

22   of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987); *see Illinois v. Allen*,

23   397 U.S. 337, 338 (1970). The right to be present is largely derived from the

24

25

Confrontation Clause of the Sixth Amendment, the primary interest secured being the

defendant's right to confront and cross-examine the State's witnesses and evidence.

*Allen,* 397 U.S. 337. The right is also protected by the Due Process Clause in situations

where the defendant is not actually confronting the State's witnesses or evidence.

*United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam).

The right extends to the process of voir dire and empaneling of the jury.

*Campbell v. Wood*, 18 F.3d 662, 671 (9th Cir. 1994) (en banc) (citing *Diaz v. United

States*, 223 U.S. 442, 455, 32 S. Ct. 250, 253, 56 L. Ed. 500 (1912)). "A defendant's

presence during voir dire is important because it allows him to observe the prospective

jurors' answers and demeanor so that he can assist his attorney in constructing an

impartial jury." *United States v. Reyes*, 764 F.3d 1184, 1194 (9th Cir. 2014). However,

"the presence of a defendant is a condition of due process to the extent that a fair and

just hearing would be thwarted by his absence, and to that extent only." *Gagnon*, 470

U.S. at 526 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 108 (1934)). "By

the [Supreme] Court's limitation of this right to "critical stages of the trial," clearly, a

criminal defendant does not have a fundamental right to be present at *all* stages of the

trial." *La Crosse v. Kernan*, 244 F.3d 702, 707–08 (9th Cir. 2001).

For example, a defendant need not be present during all communications

between a judge and a juror. *See Gagnon,* 470 U.S. at 526 (holding that a defendant's

absence during an *in camera* discussion between the judge and a juror to ascertain bias

did not violate the defendant's right to due process). When the defendant's "presence

would be useless, or the benefit but a shadow," due process does not require the

defendant's presence at a trial proceeding. *Snyder v. Massachusetts*, 291 U.S. 97, 106-

07 (1934)). Judges' discussions with counsel about peremptory challenges and

administrative jury matters are "prototypical examples of instances 'when [a

defendant's] presence would be useless, or the benefit but a shadow.'" *United States v.*

*Reyes*, 764 F.3d 1184, 1196 (9th Cir. 2014) (quoting *Snyder*, 291 U.S. 97). In

determining whether exclusion of a defendant from a proceeding violated due process,

we consider the proceedings "in light of the whole record." *Gagnon,* 470 U.S. at 526–27,

105 S.Ct. 1482.

The Washington Court of Appeals rejected Mr. Gensitskiy's claim that he was

denied the right to be present finding that the securing of the *ex parte* order to review

the jury book was not a "critical stage" of the proceedings:

> Gensitskiy also argues that his right to be present was violated when
> Klein submitted the jury book order ex parte for signature without his presence.
> We review whether a defendant's constitutional right to be present was
> violated de novo. *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). "A
> criminal defendant has a fundamental right to be present at all critical stages of a
> trial." *Irby*, 170 Wn.2d at 880. The right to be present attaches when a
> defendant's "'presence has a relation, reasonably substantial, to the fullness of
> his opportunity to defend against the charge.'" *Irby*, 170 Wn.2d at 881 (quoting
> *Snyder v. Massachusetts*, 291 U.S. 97, 105–06, 54 S. Ct. 330, 78 L.Ed. 2d 674
> (1934)). However, "a defendant does not have a right to be present when his or
> her 'presence would be useless, or the benefit but a shadow.'" *Irby*, 170 Wn.2d at
> 881 (quoting *Snyder*, 291 U.S. at 106–07). For example, a defendant does not
> have the right to be present during in-chambers conferences between the court
> and counsel on legal or ministerial matters. *In re Pers. Restraint of Pirtle*, 136
> Wn.2d 467, 484, 965 P.2d 593 (1998).
> Obtaining the jury book order was not a critical stage of the proceeding.
> As has already been discussed, the jury book order was an order that was
> obtained without argument for administrative purposes. This type of order falls
> within the scope of "ministerial" matters at which a defendant does not have the
> right to be present. Accordingly, Gensitskiy's right to be present was not violated.

Dkt. 8, at Exh. 33 (*In re Gensitskiy*, Washington Court of Appeals No. 49044-7-II

(unpublished opinion)).

Mr. Gensitskiy cites no Supreme Court case, nor is the Court aware of any

Supreme Court case, addressing whether a pretrial *ex parte* order allowing the

prosecutor to review the jury book prior to jury selection or trial, is a "critical stage[] of the trial" triggering a criminal defendant's fundamental right to be present. Nor is the Court aware of any Supreme Court case that has considered materially indistinguishable facts. As such, the Court cannot conclude that the state appellate court's determination that obtaining the jury book was not a "critical stage" implicating the defendants' right to present, was contrary to clearly established federal law or an unreasonable application of clearly established Supreme Court precedent.

Furthermore, even if Mr. Gensitskiy's right to be present at a critical stage was violated, such violations are generally subject to the harmless error analysis. *See Rushen v. Spain*, 464 U.S. 114, 117-19, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983); *Campbell v. Rice*, 408 F.3d 1166, 1172 (9th Cir. 2005). As discussed above, Mr. Gensitskiy fails to demonstrate the issuance of the *ex parte* order "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

Accordingly, this claim should be denied.

D.    Ineffective Assistance of Counsel

On habeas review the standard of review for an ineffective assistance of counsel claim is doubly deferential; Mr. Gensitskiy is required to show that the state court's application of the standard under *Strickland v. Washington*, 466 U.S. 668 (1984), was unreasonable. Petitioner fails to demonstrate ineffective assistance under this standard. *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland*, 466 U.S. 668. "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial

1   balance between defense and prosecution that the trial was rendered unfair and the

2   verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).  Claims

3   of ineffective assistance of counsel are evaluated under the two-prong test set forth in

4   *Strickland*. Under *Strickland*, a defendant must prove (1) that counsel's performance

5   was deficient and, (2) that the deficient performance prejudiced the defense. *Strickland*,

6   466 U.S. at 687.

7        With respect to the first prong of the *Strickland* test, a petitioner must show that

8   counsel's performance fell below an objective standard of reasonableness. *Id.*, at 688.

9   Judicial scrutiny of counsel's performance must be highly deferential. *Id.*, at 689. "A fair

10  assessment of attorney performance requires that every effort be made to eliminate the

11  distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

12  conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*,

13  466 U.S. at 689. In order to prevail on an ineffective assistance of counsel claim, a

14  petitioner must overcome the presumption that counsel's challenged actions might be

15  considered sound trial strategy. *Id.* "Because of the difficulties inherent in making the

16  evaluation [of whether trial counsel's performance was deficient], [we] must indulge a

17  strong presumption that counsel's conduct falls within the wide range of reasonable

18  professional assistance; that is, [defendant] must overcome the presumption that, under

19  the circumstances, the challenged action might be considered sound trial strategy."

20  *Tilcock v. Budge,* 538 F.3d 1138, 1146 (9th Cir. 2008) (quoting *Strickland,* 466 U.S. at

21  689, 104 S.Ct. 2052).

22        The second prong of the *Strickland* test requires a showing of actual prejudice

23  related to counsel's performance. In order to establish prejudice, a petitioner "must

24

25

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694. The reviewing court need not address both components of the inquiry if an insufficient showing is made on one component. *Id.*, at 697. On habeas review, "[i]nstead of considering whether [petitioner] met the burden of proving prejudice, we must decide whether the state post-conviction court was reasonable in determining that [he] was not prejudiced." *Vega v. Ryan,* 757 F.3d 960, 969 (9th Cir. 2014) (internal quotation marks omitted). In other words, under AEDPA, petitioner is entitled to relief only if the state court's prejudice analysis was contrary to, or an unreasonable application of, *Strickland*'s prejudice prong, *see* 28 U.S.C. § 2254(d)(1); or if the state court's prejudice analysis "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). We "must uphold the state court's decision if 'fairminded jurists could disagree' as to whether it was correct." *Gulbrandson v. Ryan,* 738 F.3d 976, 990 (9th Cir. 2013) (quoting *Harrington,* 562 U.S. at 88, 131 S.Ct. 770).

When considering an ineffective assistance of counsel claim on federal habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S at 101. As explained by the Court in *Harrington*, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.*

Mr. Gensitskiy argues his trial counsel's failure to object to aspects of C.S.G.'s therapist Erin Haley's testimony constituted ineffective assistance of counsel.

Specifically, Mr. Gensitskiy argues that during her testimony Ms. Haley improperly

"vouched" for the credibility of C.S.G.'s allegations of sexual abuse thereby offering an

opinion on his guilt and invading the province of the jury. Dkt. 9, at 29-36; Dkt. 1. He

argues defense counsel was ineffective in failing to object to the specific testimony by

Ms. Haley, and arguments by the prosecutor related to that testimony, described below.

Mr. Gensitskiy first points to the following exchange:

> "'Q [COUNSEL]. Okay. So, did you ever find out from [C.S.G.]
> what exactly it was that had happened to her sexually?
> A [HAYLEY]. Yes.'"

Dkt. 9, at 30-31 (citing Dkt. 8, Exh. 2 (RP 284)). Mr. Gensitskiy argues that "[t]his type of

vouching – and Haley's claim that C.S.G. told her 'exactly' what had happened – is

clearly inappropriate." Dkt. 9, at 30-31 (citing Dkt. 8, Exh. 2 (RP 284)).[7] He then notes

that "[t]hen after describing what C.S.G. had 'indicated' (RP 285) – presumably over a

long period of time during her sessions – Haley provided the following testimony":

> 'Q [COUNSEL] Yes. What sort of problems were you working on
> with [C.S.G.] that she had?
> A [HAYLEY] [C.S.G.] came in with quite a few difficulties. Initially it
> was related to anxiety and fear. After she had disclosed the
> abuse, she had been experiencing some suicidal thoughts and
> had some plans about killing herself that we needed to work on.
> She was depressed and crying a lot. She was having difficulty
> concentrating, paying attention, getting her schoolwork completed.
> She had fears that her father may try to hurt her or someone in
> her family may retaliate against her for the disclosures that she
> had made about the abuse. She was quite fearful and anxious.
> Q [COUNSEL] And did you diagnose her with anything?
> A [HAYLEY] Yes.
> Q [COUNSEL] And what was that?
> A [HAYLEY] Well, I've offered a few diagnoses. Originally when I
> first met with her on November 3rd, 2010, I offered a ***diagnosis of
> sexual abuse of a child, which indicates she was a victim of***

---

[7] The Court notes that Mr. Gensitskiy argues the defense raised "no objection." In fact, the transcript
shows the defense did object to this testimony on the grounds of hearsay and lack of foundation and that
objection was overruled. Dkt. 8, Exh. 2 (RP 284).

*sexual abuse*. And that is how we treat children who come in through our specific sexual abuse grant.'"

Dkt. 9, at 30-31 (quoting Dkt. 8, Exh. 2 (RP 286-97) (emphasis added)).

Mr. Gensitskiy also points to the fact that "[l]ater in the same examination, Haley testified that she had concluded that C.S.G. was suffering from post-traumatic stress disorder [...] [and] described the disorder as follows:

'So posttraumatic stress disorder is a mental health condition that can come on after someone experiences a traumatic event. And it includes responses such a helplessness, extreme fear, anger, and those reactions are quite common to a traumatic event, though the symptoms in post-traumatic stress disorder last at least one month after the trauma and tend to either worsen or get to a level where they're interfering significantly in someone's life's functioning. So that's post-traumatic stress disorder.'"

Dkt. 9, at 30-31 (quoting Dkt. 8, Exh. 2 (RP 288)). Mr. Gensitskiy argues that "[t]hereafter, Haley attempted to justify and validate this supposed diagnosis by noting that all of her symptoms were caused by C.S.G.'s 'persistent re-experiencing of the trauma.'" Dkt. 9, at 30-31 (quoting Dkt. 8, Exh. 2 (RP 289)). He argues that "[t]hroughout the testimony, Haley testifies that 'survivors' of abuse, like C.S.G., will often have this condition." Dkt. 9, at 30-31 (quoting Dkt. 8, Exh. 2 (RP 288)).

Mr. Gensitskiy also points to the following exchange between Ms. Haley and the prosecutor during re-direct examination:

"'Q [COUNSEL] Okay. And what made you feel that her post-traumatic stress disorder is associated with a sexual abuse?
A [HALEY] Well, [C.S.G.] had disclosed that she had experienced sexual abuse and that her flashbacks as part of her post-traumatic stress disorder were specific to the sexual abuse trauma.
Q [COUNSEL] And are her nightmares regarding any specific person or issue?
A [HAYLEY] Some of the nightmares [C.S.G.] has endorsed are related to fearfulness about her father. They were more generalized, which is common, particularly for children. The nightmares were general about her father hurting her, killing her, just fearful dreams about her father.'"

Dkt. 9, at 32 (quoting Dkt. 8, Exh. 2 (RP 308-09)).

Mr. Gensitskiy also points to the following arguments made by the prosecutor during closing argument, which defense counsel did not object to:

> "You heard from [C.S.G.'s] therapist, Erin Haley, who has worked with [C.S.G.] for almost two years. You heard that she has worked on these issues with Erin Haley, that she's described for Erin Haley the things that her father did. And she did that in an effort to get help. You heard that she's been diagnosed with post-traumatic stress disorder. That corroborates what she's saying. You heard that she's had nightmares, flashbacks regarding her father, surrounding fear that she has of him. You heard that she's on medications to help her sleep and to manage her anxiety. You've heard that she's got major depression and that she's been suicidal at times.
> And you've also heard that that's not [C.S.G.'s] personality. [C.S.G.] is normally a happy, bubbly girl. She's not a sullen (sic) teenager, but she's going through an extremely hard time in dealing with the abuse at the hands of her father.'"

Dkt. 9, at 32 (quoting Dkt. 8, Exh. 2 (RP 1285-86)). And, finally, Mr. Gensitskiy points to the following arguments by the prosecutor during rebuttal argument which defense counsel did not object to:

> "'You've heard -- some of the corroboration you've heard, which we don't need to have corroboration, but there is some corroboration and I want to talk about some of that. You've heard from [C.S.G.'s] therapist, who testified that [C.S.G.'s] been diagnosed with post-traumatic stress disorder. She told you that post-traumatic stress disorder happens from traumatic experience. You heard that she has difficulty sleeping, that she has nightmares, that she's hypervigilant with her body, that she doesn't want to be touched, that she didn't like it when Randy would try and rub her shoulders when she first moved in. And the therapist said that that is something she commonly sees in people reporting sexual abuse. That they either don't want to be touched or that they go the other way and that they are promiscuous. That corroborates what [C.S.G.] told you.'
> […]
>
> 'And you heard it from the witness stand, you saw it in the emotion expressed by [C.S.G.], you should know it by the corroboration. As far as the feelings that she's had, the PTSD, all of that speaks to its truth. Those kids were brave and they were strong and they did the hardest thing they've ever had to do. And they've gone

1
2

> through a horrible two years, and that they've gotten nothing --
> nothing out of this case, nothing but pain and of the loss of their
> family. And they came in here and they told the 12 of you
> strangers the truth.'"

3

Dkt. 9, at 32-33 (quoting Dkt. 8, Exh. 8 (RP 1333, 1340-41)).

4

The Washington Court of Appeals rejected Mr. Gensitskiy's claim of ineffective

5

assistance, in the context of his PRP, finding:

6
7
8
9

> Gensitskiy also argues that his trial counsel was ineffective for failing to
> object to Haley's expert testimony. To establish prejudice, a defendant must
> show a reasonable probability that the outcome of the trial would have differed
> absent the deficient performance. *Grier*, 171 Wn.2d at 34. Here, any prejudice
> was cured when Haley testified that she did not ascertain whether the allegations
> were accurate. In fact, Haley testified that she was not determining whether the
> disclosures or allegations were true or not.

10
11
12

> Because Haley testified that she was not determining whether the
> allegations CSG made were true, the jury could not have viewed her testimony
> as an improper comment on the credibility of CSG's allegations. Accordingly,
> there is not a reasonable probability that the outcome of the trial would have
> differed if trial counsel had objected to Haley's testimony. Gensitskiy has failed to
> meet his burden to show prejudice in his ineffective assistance of counsel claim
> based on trial counsel's failure to object to Haley's testimony and his claim fails.

13

Dkt. 8, at Exh. 33 (*In re Gensitskiy*, Washington Court of Appeals No. 49044-7-II

14

(unpublished opinion)). In reaching this conclusion, the Court of Appeals pointed to the

15

following specific exchange on re-cross-examination between defense counsel and Ms.

16

Haley in the trial transcript:

17
18
19
20

> [COUNSEL]: Is there any means as a counselor that you can ascertain as to
> whether or not the complaints of abuse are accurate?
> [HALEY]: I would say that—I guess I'm having a hard time answering your
> question. The way I look at it is, it's not my job to investigate the allegations of the
> abuse. And so I take in the disclosures that individuals share with me along with
> some collaborative information to make my determination. But again, I'm not
> determining whether it's true or not. My job is to treat the individual with the
> symptoms that they come in for.

21
22

> [COUNSEL]: So you're treating the sym—I don't want to put words in your mouth,
> but sounds like you're saying I'm treating the symptoms, not the allegations?
> [HALEY]: I guess I'm not sure how I would treat allegations, so I think that's fair to
> say I'm treating the symptoms.

23

*Id.*; Dkt. 8, Exh. 2 (RP 314)).

24
25

1    Under Washington law, "[g]enerally, no witness may offer testimony in the form of

2    an opinion regarding the guilt or veracity of the defendant[; s]uch testimony is unfairly

3    prejudicial to the defendant because it invades the exclusive province of the jury. *State*

4    *v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007) (citing *State v. Demery*, 144

5    Wn.2d 753, 759, 30 P.3d 1278 (2001)). Opinion testimony "can be defined as 'testimony

6    based on one's belief or idea rather than on direct knowledge of the facts at issue.'"

7    *Demery*, 144 Wn.2d at 760 (quoting BLACK'S LAW DICTIONARY 1486 (7th ed. 1999)).

8    Mr. Gensitskiy relies primarily on *State v. Black*, 109 Wn.2d 336, 745 P.2d 12 (1987) to

9    support his argument that Ms. Haley's opinion testimony was improper and that his trial

10   counsel was ineffective in failing to object to aspects of her testimony. "In *Black*, an

11   expert witness testified about a profile for rape victims, known as 'rape trauma

12   syndrome,' and testified that the victim in that case fit the profile." *State v. Arnold*, 5

13   Wash. App. 2d 1025, *review denied*, 192 Wash. 2d 1022, 438 P.3d 113 (2019) (quoting

14   *Black*, 109 Wn.2d at 340). The Washington Supreme Court held such testimony

15   improper in *Black* because the evidence did not pass the *Frye* test and because the

16   testimony that the victim fit the profile "carries with it an implied opinion that the alleged

17   victim is telling the truth and was, in fact, raped." *Black*, 109 Wn.2d 336. The Court

18   found such testimony invaded the province of the jury and, therefore, constituted

19   improper opinion testimony. *Id.*

20   However, Washington courts have also held that "an observation that a victim

21   exhibits behavior typical of a group does not relate directly to an inference of guilt of the

22   defendant." *State v. Jones*, 71 Wash. App. 798, 815 (1993). Thus, courts have found

23   that a diagnosis of PTSD by an expert based on an individual's symptoms, in and of

24

25

itself, does not constitute improper opinion testimony that invades the province of the jury. *See State v. Florczak*, 76 Wash.App. 55, 73 (1994). In *Florczak*, the Court determined that the aspects of the expert witness's testimony diagnosing PTSD and identifying symptoms of PTSD that could be correlated with sexual abuse was not improper, but that testimony that the PTSD was, in that complainant's specific case, secondary to sexual abuse was improper (although, ultimately, harmless). *Florczak*, 76 Wash. App. 55.

The Washington Court of Appeals, in an unpublished opinion, *Matter of Fugle*, No. 54108-4-II, 2020 WL 5536723, at *7 (Wash. Ct. App. Sept. 15, 2020)[8] recently discussed the previous analysis in *Florczak*, regarding "the line between a proper opinion regarding a medical diagnosis of PTSD and an improper opinion that invades the province of the jury." *Matter of Fugle*, 2020 WL 5536723, at *7 (discussing *Florczak*, 76 Wn. App. 55). The Court noted that *Florczak* clarified that:

> [t]estimony about a diagnosis of PTSD is not improper when it is based on identifying the behavioral symptoms that support the diagnosis. [*State v. Florczak*, 76 Wash. App. 55, 73, 882 P.2d 199, 210 (1994)]. As long as the testimony does not state that a PTSD diagnosis or the associated behaviors substantiate the claim the sexual abuse occurred, no error results from the admission of that testimony. *Id.* However, when the witness identifies the specific trauma that caused the victim's PTSD— indicating that the witness reached an independent determination that the trauma actually occurred—then the witness improperly renders an opinion on an ultimate fact within the province of the jury. *Id.* Furthermore, if the defendant is the only person implicated as the potential abuser, such testimony also amounts to an improper opinion on the defendant's guilt. *Id.*

*Matter of Fugle*, 2020 WL 5536723, at *7.

---

[8] The Court notes that *Fugle* is an unpublished decision and was not decided when this petition was filed or briefed; the Court considers this opinion because it provides a more recent outlining of the law in this area. *Matter of Fugle*, 2020 WL 5536723.

In *Fugle*, the Court also reiterated that:

> [u]nder the law, the focus of the analysis [as to whether expert opinion improperly invades the province of the jury] is *whether the testimony implies that the witness has formed an opinion on the witness's veracity or the defendant's guilt*. Context is important for considering whether testimony is an improper opinion, and we consider (1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact.

*Matter of Fugle*, 2020 WL 5536723, at *7 (citing *Kirkman*, 159 Wn.2d at 928 (internal quotation marks omitted) (emphasis added)). In *Fugle*, citing the above factors, the Court distinguished the improper expert testimony in *Florczak* from the expert testimony before it on the grounds that "the challenged [expert] witnesses offered no opinion on [the complainant's] veracity or on [the defendant's] guilt because it was established [by their testimony] that, in their role as treatment providers, they accepted [the complainant's] disclosures as true without making an independent assessment of their reliability or veracity." *Matter of Fugle*, 2020 WL 5536723, at *7. The *Fugle* court further distinguished the improper expert testimony in *Florczak* from that in the case before it on the grounds "it was not the treatment providers' role [in *Fugle*] to assess whether any actual abuse occurred, but only to develop a treatment plan for [the complainant's] complaints." *Id.*, at *8.

The Court in *Fugle* also noted that "*Fugle* pointed to [one of the expert's] diagnosis of PTSD as secondary to sexual abuse and that [another expert] testified that she saw [the complainant] for the purpose of treating the symptoms "'he was having after having been sexually abused by his stepfather Joe."'" *Id.*, at *8 (internal citations omitted). However, the Court found that "[a]lthough taken out of context, this testimony may appear to be improper, the context of the treatment providers' testimony does not

1  establish that the testimony was an improper opinion on *Fugle's* guilt or [the

2  complainant's] credibility. *Id.*, at *8.

3          There would be no basis for objection (on the grounds that the testimony

4  improperly invaded the province of the jury) as to the aspects of Ms. Haley's testimony

5  regarding her diagnosis of PTSD based on C.S.G.'s symptoms, her testimony as to

6  C.S.G.'s symptoms, or her description of what C.S.G. related to her in the course of

7  therapy. And, similarly to *Fugle*, if some of the statements made by Ms. Haley are taken

8  in isolation –such statements might be viewed as an opinion that C.S.G. was, in fact,

9  sexually abused – yet when viewed in context with her specific testimony that she was

10  not determining whether the allegations of sexual abuse were true but that her role was

11  only to treat the symptoms, these aspects of her testimony were not, in fact, improper.

12          But, even assuming some of Ms. Haley's statements and those made by the

13  prosecutor in closing argument related to Ms. Haley's testimony were improper and

14  objectionable, the totality of the circumstances show that the state court reasonably

15  applied *Strickland* to the facts of Mr. Gensitskiy's case and reasonably concluded that

16  he failed to show he suffered prejudice from trial counsel's failure to object. Specifically,

17  the Court concludes that, in light Ms. Haley testimony on re-cross-examination by Mr.

18  Gensitskiy's trial counsel clarifying that she was *not* determining whether the allegations

19  C.S.G. made regarding sexual abuse were true, the state court could reasonably

20  conclude that the jury could not have viewed her comments as an improper comment

21  on the credibility of C.S.G.'s allegations and, therefore, that there was no reasonable

22  probability of a different outcome if defense counsel had objected.

23

24

25

1    The Court notes that the state appellate court did not specifically address the

2    issue of whether counsel's performance was deficient because it concluded there was

3    no showing of actual prejudice. However, the Court also notes that there is also nothing

4    in the record to indicate that trial counsel's decision not to object to Ms. Haley's

5    testimony on direct examination and, instead, to illicit her clarification on re-cross that

6    she was not determining whether C.S.G.'s allegations were true, was not a strategic

7    decision rather than deficient performance. Here, it appears defense counsel's actions

8    could potentially be reasonably attributed to the desire not to draw additional attention to

9    Ms. Haley's opinion testimony. *See Strickland*, 466 U.S. at 689 (The Court has a strong

10   presumption that counsel's actions were sound trial strategy rather than inappropriate

11   error.).

12   Accordingly, the Court finds Mr. Gensitskiy has not demonstrated the state

13   appellate courts' conclusion was contrary to, or an unreasonable application of, clearly

14   established federal law, or was an unreasonable determination of the facts in light of the

15   evidence presented at trial. Accordingly, this claim should be denied.

16   <u>CERTIFICATE OF APPEALABILITY</u>

17   If the Court adopts the undersigned's Report and Recommendation, it must

18   determine whether a COA should issue. Rule 11(a), Rules Governing Section 2254

19   Cases in the United States District Courts ("The district court must issue or deny a

20   certificate of appealability when it enters a final order adverse to the applicant."). A COA

21   may be issued only where a petitioner has made "a substantial showing of the denial of

22   a constitutional right." 28 U.S.C. § 2253(c)(2)-(3). A petitioner satisfies this standard "by

23   demonstrating that jurists of reason could disagree with the district court's resolution of

24   his constitutional claims or that jurists could conclude the issues presented are

25

adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

The undersigned recommends that petitioner not be issued a COA. No jurist of reason could disagree with the above evaluation of his constitutional claims or conclude that the issues presented deserve encouragement to proceed further. Petitioner should address whether a COA should issue in his written objections, if any, to this Report and Recommendation.

<u>CONCLUSION</u>

Based on the foregoing discussion, the undersigned recommends that the Court dismiss the petition for writ of *habeas corpus* with prejudice.

The parties have **fourteen (14) days** from service of this Report and Recommendation to file written objections thereto. 28 U.S.C. § 636(b)(1); Federal Rule of Civil Procedure (FRCP) 72(b); *see also* FRCP 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the above time limit, the Clerk shall set this matter for consideration on **November 20, 2020**, as noted in the caption.

Dated this 4th day of November, 2020.

Theresa L. Fricke
United States Magistrate Judge